Why, I would ask the attorneys who plan to argue to step up to the mic, identify yourselves for the record. Both, yes, please. Well, I'm Kimball Anderson. I practice with Winston and Strawn and I represent the petitioner, Mr. Bradley Lieberman. Good morning, your honors. My name is David Biskowich. I'm with the Illinois Attorney General's Office on behalf of the people of the state of Illinois. I think both of you have been here before, if I'm not mistaken. So you pretty much know the drill, which consists of two parts. One, what I tell you the drill is, and two, what the drill actually is. Because you do get under the rules 15 minutes per side, of which the appellant may retain whatever amount for rebuttal. In actuality, you know that we are not clock watchers here. But we feel we ought to give you a reasonable opportunity to complete your argument, but not one that would unnecessarily impinge on the time of the next case. So with that in mind, if the appellant is ready to proceed, please do so and you can take your seat. Thank you and good morning and may it please the court. Morning. This case presents what I think is an issue of first impression, namely the deficiency of evidence necessary to establish probable cause. What's the standard of review? It's abuse of discretion, I believe. So we always have to filter it through that standard of review, don't we? Yes, we do. And filtering it through that standard, I believe that there is ample precedent and ample record here to conclude that the Supreme Court did abuse. However, let's get one premise defined so that, because I know that in the briefs it gets some play before it's finally crystallized, let's start with the crystallized version. The fact of the matter is that the crime itself cannot provide a basis for the subsequent detention. That would be, among other things, double jeopardy. It would also probably infringe on many constitutional protective barriers, including the fact that it would be parading a detention statute as being something other than an attempt ex post facto to extend the term. Okay. We know that. On the other hand, we also know that that does not preclude expert evidence from reviewing the circumstances of the crime to determine whether in those circumstances there inheres a mental disorder which is present or remains present as of the time, the sentence is terminated and the detention proceedings commence and are renewed as they are supposed to be periodically and of which this appeal is now taken from. Now, do you agree with that? Essentially, yes. Okay. I think I've saved at least ten minutes of argument with that. Maybe so, and thank you for making my argument for me. I will quarrel with one thing you said in that the statute requires more than just a mental disorder. There's two essential elements. One is a mental disorder, but two is it has to be a disorder that makes it substantially probable that the person committed is going to re-offend if released. So that's an important second required element of the statute. And I thought I would briefly review the factual background, but I want to also get to the heart of the matter, obviously, which is why I think the Circuit Court misconstrued the statute and therefore abused its discretion. There's ample precedent that misconstruing a statute and making findings that have no support in the record is an abuse of discretion under any standard. I'm sorry to interrupt you, Judge McBride. That's all right. Misconstruing the statute, but going back to what you said, the two-prong test, that there is a disorder and that there's a likelihood that the offender will commit a sexual crime again. Yes. In this case, you would agree that your – well, the defendant's – respondent's expert said that there was a great likelihood he would not re-offend, and the two state experts said there was this likelihood that he would re-offend. Is that – would you say that's a fairly accurate description of their testimonies? Well, fairly but not completely. To be sure, Dr. Chester Smith, who we called and is a renowned expert on sexual disorders, found no mental disorder and no likelihood to re-offend. Similarly, Mr. Lieberman's treatment staff at the facility have concluded the same. But here's what the other two experts that were called on behalf of the state said. Dr. Ostroff, who was the circuit court's court-counted expert, testified that he could not tell – this is basically a quote from the transcript – he could not tell whether Mr. Lieberman would be more or less than 50 percent likely to re-offend if released. How likely does he have to do the ratios have to be in establishing likelihood? Does it have to be more than 50 percent? Does it have to be more than 30 percent? To what extent – to what extent, first, does the statute, the sexually violent person statute, attempt to reach? And at what point would they encounter a constitutional impediment? Supposing it were, for example, picking on somebody that hopefully has no right to sue for defamation to test my judicial immunity. But let's assume it's Gacy. And let's assume Gacy would have, if he were released, a 15 percent chance of repeating his crimes. Would then the sexually violent persons act cease to apply? Excellent question. I think it goes to the heart of the statutory construction. Wouldn't it depend, at least to an extent, on the nature of the crime at risk? I think to answer that question, we should turn to the statutory text, which is what I'd like to do. I'd like to parse it with you, and I think if we parse it, the answer becomes apparent. The statute, which we're dealing with here, is Section 60 of the Act, and that is the probable cause section. I want to parse the words for you because I think that that will answer your question about the threshold here. The exact language appears at the bottom of page 4 in our brief, but I'm just going to read it and then parse the words with you. The statute commands that if the court determines at the probable cause hearing that cause exists to believe that it is not substantially probable that the person will engage in acts of sexual violence if on release or conditional release, the court shall set a hearing on the issue. Now, procedurally, of course, we never got a hearing. Our hearing was eviscerated because the judge found no probable cause on this record. But getting to your point, Judge, let's look at the statutory language. It talks about substantially probable that the person will engage in acts of sexual violence. Well, substantially probable is not defined in the Act, but it's not a term that lacks clear meaning. We know what probable means. You go to the dictionary and it says likely. We also see the word, the legislature put the word substantially in front of probable, and we know from that... Does probable necessarily mean by a preponderance? No. Does it even have a number attached to it? In other words, I'd like to go back to what I was asking you, and that is when two different doctors have the opinion that he is substantially likely to re-offend, does the trial judge under his discretion, or as we're reviewing that part of use of discretion, does he have the right to review all that testimony and decide which side he comes down on? Not at the probable cause hearing. Not at the probable cause hearing. You have to look at the statute, which I'm sure you have. Probable cause is the lowest evidentiary standard here. The Supreme Court of Illinois and the appellate court have repeatedly said it doesn't involve a more likely than not standard. Probable cause not to re-offend? Substantially? Yes, that's what I was trying to get to, because I think this answers all of your questions. It says probable cause is to believe that it is not substantially probable that the person will engage in acts of sexual violence. Okay, substantially probable. And obviously, under settled rules of statutory construction, we have to give all the terms meaning. We cannot construe it to render the word substantially superfluous. But we're reviewing Judge Porter's review of the testimony for an abuse of discretion. You just said that earlier. And your opinion is that out of the testimony that was presented at the hearing, Judge Porter could not conclude that? He could not conclude that there was no probable cause, no even reasonable belief, that Mr. Lieberman was substantially probable to re-offend immediately upon release. Substantially probable means more than just likely. It means it's very likely. I don't know. I think you've taken and thrown out any review by the trial court then of the testimony that he heard, that he listened to, and that he watched. Judge, we didn't have a trial here. We had a probable cause. I understand you didn't get his probable cause, request for probable cause. You didn't get to the hearing. I'm still troubled epistemologically here. Because if he needs substantial likelihood for a hearing, what does he need at the hearing? Certainty? No. It's a civil proceeding. So where is the differential between the prediction that entitles him to the hearing and the finding that would entitle him to release? The distinction is that the probable cause hearing, we're not weighing the evidence. We're not engaging in credibility. But we're not simply engaging in a hearing just for the fun of it. No, we're not. And the committed person has a burden to come forth with some credible, reliable evidence showing that he doesn't suffer from the type of mental disorder that will cause him to be substantially probable to reinvent. So you're saying that that substantial probability is both the test for the hearing and the test for the ultimate release. You're saying it's the same test. Yes. But the evidentiary threshold at the probable cause hearing is low. The Supreme Court has made clear it's not a more probable than not. It's not beyond a reasonable doubt. It's a preliminary prima facie case. And if you look at the entire structure of this statute, it is not an indefinite detention statute. It contemplates that these people that have been civilly committed have a right to petition for release every six months. Okay? And what happened to my client and what is happening in other cases arising out of the SPP is that the State is avoiding any kind of full merits hearing by coming in and presenting experts who create a jump ball, a battle of the experts. And I respectfully suggest to you that there's no battle of the experts exception in the statute for avoiding this full hearing. But I would necessarily suggest that there may be better test cases than testing the case of a serial rapist who has been charged with, what is it, seven and convicted of seven rapes and charged with many others. You have that kind of situation which really tests the sufficiency of the circumstances surrounding the crime to give ultimate credence to any expert testimony that will use the circumstances of that crime to establish substantial probability. Your test would be better wrought where you have a single offense or an occasional or sporadic offense, but it's a harder one to undergo under facts establishing serial criminality because that seems to be viscerally laden with disease. Well, with all due respect to all of us in the room, none of us have degrees in psychiatry. I wouldn't make that presumption. I think Justice Gordon may have. Well, I may have not done my homework, but if Justice Gordon is familiar with the literature, he knows that the literature suggests that 90% of rapes are committed by people who do not have any mental disorder. They may be evil people. Well, you know, the judge used that reasoning. Do you think that there's any evidence here that he fits into that 90%? Yes. One of the world's leading experts, Dr. Chester Smith. When you say one of the world's leading experts, let's talk about the practical nature of his testimony and how the trial court viewed it. He went back to how he believes the nature of these sexual assaults occurred. And he gave his opinion that it probably resulted from a sexual encounter that Mr. Lieberman had in his younger years as an 18-year-old or something younger than that, that because he had a sexual encounter with a woman who first gave him the impression that she did not want to have sexual intercourse with him, but then she allowed him to, that that was something that may have led him to that. That may have caused him to commit or believe that he could have sex with women who didn't want to because of that incident, and then there was some other thing that he stated. Didn't he give another suggestion about how he thought Mr. Lieberman came to commit these? Now, I don't want to get too far off the track, but you portray your expert as someone who's renowned in the field. He never treated any sexual offenders, did he? Ever? I think he's been treating sexual offenders at Johns Hopkins for decades. Offenders that have been incarcerated? Offenders who have been incarcerated. I thought that came out during the hearing, that those individuals that he's treated were not individuals that were individuals who had been in the penitentiary for offenses where they were sentenced to the penitentiary. Now, I could be wrong. I recall that in this record. What was the other reason that he gave for his opinion of how Mr. Lieberman committed the offenses initially? I recall he said, fundamentally, we may never know, and your comment about being a little off track is, I think, half, because the test is not, can we divine why he did this 30 years ago? The test is, does he have a mental disorder now that's going to make him substantially probable to reoffend? There, the evidence is no, and my point on probable cause is even if it's a jump ball, even if you've got a panel of the experts, you don't eviscerate the statutory right to move on to a full hearing, and that's what happened here. That's how the judge misconstrued the statute. Your expert gave an opinion that he doesn't have a mental disorder, is that right? Yes, based on his present evaluation. Didn't he partially base that on his own opinion about how these offenses were committed? Even though he said we may never know. Fine. Didn't he explain what his opinion was? No, I think his opinion was based on his evaluation of Mr. Lieberman presently, based on his review of the mental health professional staff evaluations of Mr. Lieberman over the past 30 years, because that is the statutory test. What is, does the person have a disorder now? It's not a guessing game as to why the person committed these behaviors 30 years ago. He also included in his diagnosis a possible explanation as an alternative to finding disease, a mental disorder, and that alternative explanation was counterintuitive. Okay, fine. Science is often counterintuitive. That's, or can be counterintuitive. Well, it can be, but it certainly would have a hard time getting past establishment experts who testify to the contrary, and where their testimony is more in line with the evidence. And in the area of mental health, particularly, the courts have not surrendered yet to expert testimony, so as to deprive the judge, the Mise Prius judge, who hears the testimony, from formulating his own opinion. Now, I'm not a particular friend of that, as you know, from my Wilhite opinion, and from my Baker opinion, and several other opinions of the judge bucking the experts all by himself, but that is the present posture of the rule. And so you're talking about an explanation that seems to be very flat, like he's committed seven rapes and several others for which he's been charged. Because, as an adolescent, among other things, he thinks that the woman might say, no, no, with her mouth, but yes, yes, with her eyes. Now, the judge considered that frivolous, and on the other hand, he had counter-testimony that established that this man was, in fact, diseased, in that he was compulsively attracted to a woman. Rape by coercion. Now, you know, that's the battle you're confronting. With all due respect, I think you're off track in this following respect. What you have articulated is an assumption that because someone engages in aberrational behavior 30 years ago, that they necessarily have a lifelong mental disorder that justifies indefinite detention. And that proposition, or that hypothesis, has been rejected by the Illinois Supreme Court and the United States Supreme Court, and I believe it doesn't fit. No, that hypothesis has not been rejected by Samuelson, if you're using that as your Supreme Court case. Samuelson reiterates that you cannot extend his sentence for his original crime, but does not negate the fact that you might go back to the circumstances of the original crime and find that there exists some other possibility. There's a disease which is still current and ongoing. Yes, but fundamentally, the statute and the precedent requires the focus on the presence. The presence is whether the person has a disease that is a mental disorder that is going to cause him to be substantially likely to reinvent. And we're not at a trial stage here. We are at probable cause, as I have said, now ad infinitum. But that makes a difference, then, as to what, how your expert presents his opinions. You're acting as if any expert, regardless of the opinion, guarantees you a probable cause determination. And I don't think that's the case. Well, isn't the flip side also true, that the state can then eviscerate the statutory right by bringing in any expert? I've been in the litigation business for 33 years. I can find an expert. It seems kind of odd that the brief suggests that, you know, one side has hired experts or hired guns, the other side doesn't. But all I'm trying to say is that this is expert intensive. This petition to have your probable cause hearing is going to be based on expert testimony. And I think you're ignoring the ability or the right of the trial, the finder, to at least weigh or look at what you have presented and what the state has presented. And so I think that what Dr. Schmidt says is important. And we have to review it. But the trial court had the first review of that and had the first review of the other two doctors. But I think that the expert testimony is critical. I don't think this is a case where we cannot look at what those experts said. I'm not disagreeing with that, but there is non-expert evidence in the record that I will address in a second. But ultimately, this circuit court found that there was a jump ball. And my point is that a fair statutory construction of this scheme is that if there's some jump ball, which means both sides have put in credible evidence, you've established that threshold probable cause if the state doesn't get to eviscerate the individual's right to a release hearing. That's fundamental in this statutory scheme, and I hope I've made that point. I'd like to also talk about the non-expert evidence. I think you have made that point. I think that's a fair point. I think that's a fair reading of the statute. But what about when Justice Gordon said to you that Judge Porter said that Dr. Schmitz, although he had substantial credentials, what about his statement that he thought that the opinion, a large portion of the opinion he gave was frivolous? How do you respond to that? Well, first of all, I don't think it's fair to try to inoculate your conclusions that have no basis in the record with the catchwords, you know, I don't find the witness credible. And I think that that's what happened here, frankly. I think if you look at this record, there is substantial, credible evidence that Mr. Lieberman is not going to reoffend. And you can start with the court's own expert who said he couldn't predict whether Mr. Lieberman was more likely than not to reoffend. You can look at 30 years of incarceration where he is not engaged in any violent acts or sexual crimes. Let's take that. Stop right there. Where did he have an opportunity to demonstrate that he still is violent when he's subject to prison regulation? The fact of the matter is you have secondary facts. You have the facts that for 25 years he refused to admit his crime and only admitted it very recently. Two, he's rejected treatment conceivably and may very well be the case because his lawyers told him don't take treatment. But he also said he doesn't want to sit and listen to other people confess their crimes. Thirdly, he seems non-repentant about what he did. He himself got married and never really expressed any empathic feelings towards his victims. And there are other indicia which obviously can be spun either way, but they certainly have validity if spun in the direction of sustaining the verdict of the trial judge. I disagree and I think your comment about him not expressing any remorse is flatly untrue and I think you've also left off some other compelling evidence by the mental health staff at the facility. I said empathic. I didn't say expressing some nominal regret. There was no empathic element in his statement. Okay, that's a very subjective observation. Well, aren't we all being subjective this morning? Other pieces of critical evidence. Mr. Lieberman was evaluated by licensed mental health professionals for the 20 years that he served his sentence. There are 15 such evaluations in the file. He was tested repeatedly. No evidence of any mental disorder. He's been tested and treated and evaluated by the staff for the last 10 years and as we pointed out in our brief, the staff has now given him a global assessment functioning score, a GAF score of 71, and that's a recognized analytical tool in the DSM. 71 is normal functioning. Low scores are a reason for concern, but 71 reflects a transient at best reaction to normal psycho stresses, which all of us have every day and we're not incarcerated 24 hours a day. So the people that are working with him and around him every day have given him a global assessment score of 71. Were those scores necessarily cognizant or did they take particular note of the fact that in committing his original crime, he used disguises? He disguised himself as a plumber. He's someone who has, you know, I don't want to say sociopathic because that would be going too far in my trying to make a diagnosis. But this is a man obviously who has at least demonstrated some degree of success in disguising himself. So your hypothesis is that for 30 years under the care of mental health professionals, he's fooled them all. That's a preposterous hypothesis, that these skilled professionals in 30 years haven't been able to detect some mental disorder and are giving him a global assessment functioning score of 71. But I thought he has never received any treatment at all during this 30 years. No, that's not true. He sees a primary therapist. There are two programs. There's a responsible living program and then there's the other treatment program, which Judge Gordon referred to. And let me tell you why he has decided not to participate in that, because it's a catch-22. To participate in that, you have to sign a form that admits that you lack volitional control. And he has seen time and time again when other residents sign that form that says, I admit I lack volitional control, I need treatment, that that then becomes the key piece of evidence to detain these people indefinitely. That is the catch-22 going on here. Well, what is the treatment that he's been receiving for his... You say the witness said he doesn't have a disorder. Is that right? So what would he receive treatment for then, anyway? He has a primary therapist. Dr. Mark Babula is his name. His testimony is in the record. He administers the tests. He counsels him. Okay, so he has received counseling. Yes, he has a primary therapist, Dr. Mark Babula. Presently he's had other therapists in the past. But it's those people that are seeing him on a daily basis, seeing how he functions on a daily basis. Those trained and licensed professionals have assessed him as normally functioning. And they have not diagnosed him with any... The only people that have diagnosed him has been basically the paid experts who have come in with a diagnosis that, as we have pointed out and shown in the record, to be junk science, not in the diagnostic... Well, you know, not in the DS... was it DSM? It's not the equivalent of junk science. That is a term that is not a positive to not seeing... Well, it's a pejorative term, and I don't use it lightly, but... Well, because what is in that catalog? Is paraphilia in that catalog? Or is it that paraphilia non-consent is not in the catalog? But paraphilia, is that in the catalog? Yes, but paraphilia... Paraphilia, according to one definition, means, among other things, a penchant for having sexual encounters with non-consenting parties. So the words non-consent may not be part of the designation as a subclass, but it's in the genus of paraphilia, according to that definition. Well, again, I... I happen to have that with me. Well, again, I defer to your expertise with the DVM, but I call them... we call the stand the person who... I'm not professing expertise in that any more than you, but on the other hand, we have to define what we're talking about. If we're saying that the entire category, it has not been cataloged, then maybe it's junk science, although I read the New Yorker article on how the DHSM is put together, and it's in the hands of one particular expert who made all of the difference, and I read about the political debates that have gone on with regard to how to characterize, for example, homosexuality, and it's not necessarily all science. It's also politic. Now, and that's even manifest from your brief, because part of the reason that paraphilia might not have been included non-consent is not to give a defendant an out of claiming mental disease when he's charged with the crime. Sure. Two points here. First of all, the record below. The record below reflects the testimony of the person who chaired the committee and who testified that the American Psychiatric Association expressly voted not to recognize this diagnosis. Point number one. Point number two, even if there is a disagreement or controversy among professionals as to whether it should be officially recognized in the DVM, I get back to my point, which is if there is a healthy controversy, if reasonable people can disagree, as there apparently is reasonable disagreement here, then you have met the statutory threshold for probable cause. Whether it's more probable than not that it's a recognized diagnosis, all of that is handled at the evidentiary hearing. Did Dr. Schmidt categorically rule out that a rape can be committed by someone as a result of a mental disorder which seems to propel him to seek sexual gratification through coercion? Did he rule out the fact that that can be a disease? Here's his testimony, and the short answer is no, but here's his testimony. He says approximately 90% of rapes are committed by persons who are not suffering from any mental, sexually related disorder. I understand, but does that mean 10%? If he didn't rule it out as a disease, why would you call a term of art, so to speak, which identifies that disease junk science? I call it junk science because... Even if it describes 10%, it describes an actuality. There is that syndrome. No, I think we're talking about two different things. I hope not. This particular diagnosis that Dr. Swire has relied on, the state's expert has relied upon, I think if you barely look at the testimony and the manual, it is not recognized, and it was not recognized because the profession determined that it was not scientifically... Did not recognize it as an independent category does not mean it did not recognize the syndromes as describing a valid mental disorder. I disagree with you. Dr. Smith's testimony is that this paraphilia non-consent quote is a made up, non-official, scientifically unsupported diagnosis, end quote. Is paraphilia... Paraphilia, not otherwise specified, is recognized in the DSM, isn't it? Paraphilia, otherwise non-specified, non-consenting? No, not non-consenting. Let's get to the first one. Paraphilia is a recognized mental disorder. Did Dr. Smith say it's not a recognized disorder? I think Dr. Smith said that there are paraphilias that are not categorized and not recognized as mental disorders. There are behaviors, but not mental disorders. Did he acknowledge that paraphilia is a mental disorder? No, he said that there are paraphilias... Did he say that paraphilia can describe a mental disorder? Or did he rule that out? I don't think he made any sweeping statements one way or the other. He did not rule that out. Either he did or he didn't. If he didn't, then what's in a name? If it describes what can be a valid syndrome, then all that Dr. Smith could say to that is that this man is not in the 10% that are victims of that disorder, but he's in the 90% who are not. That's all he could say. And that's all his testimony would be tantamount to. I don't know that that's a fair characterization of his testimony at all. There are paraphilias that are behaviors that do not rise to the level of mental disorder. But if there are paraphilias that do, and it's a matter of statistical allocations, then you can't characterize Dr. Smith's testimony as characterizing non-consensual paraphilia as being junk science. At best, you can only say that he, on his examination, found this particular petitioner to be in the 90% who are not suffering from that disorder. Well, I'm not going to quarrel with you any further on it, but I think if you look at this record, we have a learned expert, we have 30 years of history, we have the mental health state facility, and we have the court's own appointed expert giving testimony on which the conclusion is unmistakable. No one thinks that Mr. Lieberman is imminently or probably likely to re-offend upon release. And that's the probable cause standard. And I get back to the central point is here, we had a probable cause hearing. We didn't have a trial on the merits. And what has happened here is the circuit court misconstrued the statute to believe if there's a junk ball, there's no probable cause. You've got competing experts, as Justice McBride has pointed out. You've got a disagreement in the profession as to whether this diagnosis should or should not be in the DVM. And my point is, granted, you have that. Well, if you have that, if that is the junk ball, namely, the proper scientific characterization of the behavioral patterns in question, what's going to be gained at the hearing since the patterns themselves are not an issue? What is an issue is how that falls into whatever scientific opinion that might best be acceptable. And if that's all that is involved here, hasn't that hearing already taken place in determining whether he's entitled to it? I don't think that that's all the issues. I think that's just one issue out of many. And that is the problem. Your statement right there highlights the error below. The trial judge conflated the hearing on the merits with the probable cause hearing. No, I think the point that I'm trying to make is that just because there's a battle of experts as to how to characterize a given pattern of behavior does not render that behavior to be challengeable under a substantial probability standard. Because the court can determine which science it wants to follow here or which opinion it gives greater credibility to, at which point the question then turns on whether the behavior which is being characterized is actually what it's represented to be. And if there is some conflict there, then a hearing becomes appropriate. Well, I'm not sure I followed you entirely, but I am going to revert to the plain language of the statute, which calls for probable cause to believe that the petitioner is substantially likely, not just likely, but substantially likely. And I revert again to what the Supreme Court and the appellate courts of this state have said about probable cause. It's not a more likely than not. It's not that you have a burden of showing that you're right or wrong. It is putting forth, you just can't walk in on a wing and a prayer, but if you put in some credible evidence, you've met a probable cause standard. If that wasn't the case... No, I don't. I think the judge concluded that there was a battle of the experts. He says on the record he finds the statute very difficult to administer. He's got one expert saying this, one expert saying this, and he basically found a contest in the evidence and declared game over when the statutory scheme does not allow game over. The petitioner has a statutory right to move forward. I grant you the petitioner can't come in on a wing and a prayer, but I don't think it's fair to look at this record and say, well, that's what we did here. We brought in one of the world's most experts, and we also called, through deposition testimony,  so for Pete's sakes, we didn't walk in on a wing and a prayer here. The facility testimony... I don't know how this facility testimony necessarily supports what you're saying, because everybody that has been around him, worked with him, the therapists, they're in a setting that's completely artificial, aren't they? What is natural about the setting of the penitentiary or the facility? Actually, it's not the penitentiary, it's the facility where he is. So I'm not saying that that's... You're basically saying that your evidence was credible to get to this probable cause hearing and that the court totally misconstrued... The standard. Yes, that's my point, and you're absolutely right. Detention's not the ordinary course. It should be the ordinary course. It should be the presumption, because at base, we are a society that values liberty here, and we are a society that values our constitutional rights, and we're a society that doesn't allow the state of Illinois or any other government entity to engage in self-help sentencing. The state of Illinois has determined what the sentence is for these crimes. A judge has determined what the term of imprisonment is. And that's changed over the years. At one time, you could commit five, ten... There were people that committed ten rapes that were allowed to be released, come back out, rape again, come back out. The statute changed. Then it became, if you committed three rapes, you were going to be sentenced to life in prison. Then subsequent to that, it became that two rapes and you would be committed for life. Then we had... Well, before that, then we had this commitment under a civil proceeding for offenders who had or suffer from a mental disorder and that are likely to re-offend so that they can, after this penitentiary sentence, can now be civilly committed. Yes, they can be civilly committed. The whole dynamics of this has changed, and yes, we're dealing with a statute. You say this is a case of first impression. Are you saying that there is no other guidance on whether or not to get to the probable cause hearing, that this is the very first one? Under this Section 60 of the Act, yes. But I'm also saying you can apply accepted Illinois jurisprudence on the meaning of probable cause and on the meaning of substantial probability. I'm saying that. And I want to add one more point. To be sure, the statute does allow for civil commitment of persons who have been found to have a mental disorder, blah, blah, blah. But the statute also made clear that this is not another lifetime indeterminate sentence, that they have the right to come in every six months and have the situation reassessed based on their present situation. And the Supreme Court has further said that in that assessment of the present situation, you have to have something more than the fact that they committed bad acts that they were convicted for. So we're all agreed on that. And within that statutory framework, you know, Mr. Lieberman's entitled to come in, not on a wing and a prayer, which didn't happen here. We put in substantial evidence. And with that, we've met the minimum probable cause threshold, and we're entitled to move on. This judge misconstrued it, battled the experts, game over. You don't get your hearing. You don't get your discharge hearing. Is there anything more that you'd like to add? Let me ask you just one thing. Sure. What you'd like us to write, then, is that when a defendant presents some evidence of lack of a mental disease or disorder, he should have a probable cause hearing as a matter of right. Is that what you want us to write? No, you would have to add with an expert from Johns Hopkins. I'm not sure about the University of Chicago. Am I wrong? Is that what you would want us to write? I wouldn't phrase it like that. I think the respondent has the burden of bringing in some substantial evidence, some credible evidence, some evidence that would lead any reasonable belief, is what the Illinois Supreme Court would allow a reasonable belief. Not more likely than not, not make it true or false, certainly not beyond a reasonable doubt. But if there's a reasonable belief, based on the record, that that advances the ball to the hearing. That, I think, is a fair construction of the statute. I wouldn't say any evidence, because we can all imagine hypothetical horribles, but I think the language can be crafted consistent with the statute and consistent with the Illinois Supreme Court definitions of probable cause. Thank you. You'll still have a couple minutes for rebuttal. Good morning, Your Honors. Mr. Anderson, Ms. Powelson. May it please the Court, again, my name is David Iskowitz with the Attorney General's Office on behalf of the petitioner appellate. One thing I'd like to state up front, I know the Court covered a lot of ground in the last few moments with my opponent, and I'll do my best to cover as many points as possible. This is actually not a case of first impression. On pages 29 and 30 of my brief, I cited three other appellate court cases, Ottinger, Cain, and Blakey, all of which have confronted the question what constitutes probable cause at the stage of proceedings, and all of those cases held based upon its assessment of the evidence under the abuse of discretion standard that the respondent in those cases hadn't had its burden of showing that there was probable cause to proceed to the second stage of hearings under the Act. So this isn't a case of first impression. One other point I'd like to get out of it. However, the battle doesn't end simply because there are experts on both sides. That's not an automatic pass for the trial judge. He still has a duty to review the predicates for the opinions of the different experts and make some evaluation as to the strength, or relative strength, of each of those predicates. And when that predicate for expert testimony consists solely of the facts committing the crime, there ought to be some greater vigilance, because that can easily be transmuted from the occurrence of the crime itself. There has to be a clear indication that the crime itself is not being resentenced, that there are other factors, and they have to be plausible. The judge can't simply pass off his burden by saying, well, I simply have, there's an expert I can rely on, ergo I haven't abused my discretion, or ergo it's not against the manifest weight of the evidence. He has to go beneath the testimony. Why would the testimony here of the State's two experts suffice, since what do they have to rely on other than the crime itself? The experts here relied on a number of other sources in arriving at their opinions, Your Honor, not only the facts of the offenses, which is what the respondent claims is the sole basis of information. And I might add up front, as a legal matter, the U.S. Supreme Court has held explicitly that it's completely appropriate in an SVP case or civil commitment case for experts to review evidence and facts of past crimes. If it's received, and this is a direct quote from Kansas v. Hendricks, not to punish past misdeeds, which would implicate ex post facto in double jeopardy concerns, but primarily to show the accused's mental condition and to predict future behavior. That's exactly how Dr. Swearer and Ostroff assessed this evidence. With a 30-year gap between the commission of those acts and his current examination. That's true, Your Honor, but there's no authority that I'm aware of that puts a number on the gap of years that must accrue between the offensive issue and the current mental state. They both testified that within You're turning the sexually violent detention act into almost an impregnable fortress. Not necessarily, Your Honor. In this case, the experts also relied on a wide array of other documentary proof in arriving at their opinions, and this is apparent from their submitted written reports. Those reports are at the respondent's appendix at A41 and at A63. They relied on DOC records, DHS records, clinical interviews, trial transcripts, police reports, psychological reports. Police reports and what clinical interviews, since all of his examinations following his internment seemed to come up positive, except for his refusal to participate in treatment, for which he has a valid explanation. And the fact that he hasn't been quick to admit his crime. Well, Your Honor has pinpointed a number of considerations that went to inform the expert opinions. His lack of empathy in the clinical interviews, his response to the question, what do you think the victims here would say if they knew you were going to be released? His answer was, well, I don't know, most of them are probably not even living in the area anymore. That certainly informed Dr. Ostrov's opinion that this gentleman still suffers from a paraphilic condition, that he hasn't improved, he hasn't undertaken any treatment. He just, within the last couple of years, finally admitted he did some of these crimes. But according to Dr. Ostrov's interview, within that admission or acknowledgement that he did some of these crimes, he still dissembled quite a bit with respect to which ones he did and didn't do. He only admitted to doing the ones for which he was convicted. But why, if all it calls for is the hearing, why should that be denied when so much time has passed and so much post-occurrence evidence is basically so nebulous and inconclusive, in and of itself, why shouldn't he get the hearing? Well, Your Honor, this goes back to Justice McBride's question about the trial judge's role here in the proceedings and whether or not he was authorized at this stage to weigh the evidence. And I disagree respectfully with my opponent that that wasn't Judge Porter's duty at this point in the proceedings. According to Judge Porter's oral ruling at the end, he did weigh this testimony and he found that Dr. Schmitt's opinions to be somewhat lacking. He found, on the other hand, that Swearer and Ostrov's opinions were... Well, I don't know that that would get you past the probable cause. He found that the opinion with respect to the no paraphilia to be, quote, absurd. And he found that there were holes in Schmitt's testimony that this disorder didn't exist in the first place. And there's a lot of holes in Dr. Schmitt's testimony that the trial court... Well, there are crimes that are committed persistently by recidivistic criminals who are not diseased. Correct, Your Honor. Because otherwise we wouldn't have penitentiaries, we'd only have asylums. Correct, Your Honor. So why should it be ruled out per se if an expert comes up and says he may be a serial rapist, but he commits each rape based on kind of an opportunity? Opportunity, of course. Well, that's exactly what Dr. Swearer and Ostrov said wasn't happening in this respondent's case. He was not a rapist of opportunity. And the record bears this out. And this Court is very familiar with the record. The use of disguise, the use of trickery, the use of coercion, the planning, the surveillance. He committed incessant rapes beginning from the late summer of 79 through about Christmas of 1979, was arrested, posted bond, and continued to do the very same thing he had been arrested for. He couldn't stop. He was finally arrested in May of 1980. This certainly informed the expert's opinions that not only is there something about this particular respondent that's wrong, and not only does he meet the criteria for the paraphilia section of DSM, but that he's not in that whatever 10 percent, I'm sorry, 90 percent of people that just rape as a matter of opportunity. If they burglarize a home, for instance, and I think it was Dr. Ostrov. What determines for the trial judge that the substantial probability has not been raised? Raised, Your Honor? Yes, to entitle him to a hearing. It's based on the expert opinions. The risk assessment tests, the facts underlying the expert's opinions, the individual's behavior while in DOC, and the reports in this case certainly informed Judge Porter's opinion again that, and this Court is aware of this because in the direct appeal from his SVP trial, it was brought out that on numerous occasions while in the Department of Corrections, this respondent continued to write unsolicited letters to women who he didn't know, telling them lies, dissembling, explaining to them that he was a millionaire and that when he got out, he was going to be inheriting properties. All of these things in the record informed not only the expert's assessments that he has a mental disorder, but rightly informed Judge Porter's decision, again, that this Court reviews for an abuse of discretion, that the respondent in this case hadn't met his burden to move on to the second round of proceedings. Is there anything more? There's nothing else I'd like to say, Your Honor. One point came up about Dr. Schmitz having never evaluated a person for sex disorders. Not evaluated. I thought there was something in the record about whether he has ever treated criminal defendants that suffer from sexual disorders. He's never evaluated an SVP for purposes of civil commitment. That's what he testified to. But you don't dispute his preeminence. I can't dispute his preeminence, but again... His preeminence is what? What is he an expert of? He was on the drafting committee for DSM. But again, and I don't want to sound like a broken record here, but we must defer to the trial court's finding of credibility with respect to what he testified to, the GAF. This was not only outweighed, according to Judge Porter, by the wealth of other evidence showing that he's at a high risk to reoffend if he's released or conditionally discharged, but I might note that the global assessment of functioning measures the ability to maintain a certain level of social propriety in society. But this is really not correlative to any risk upon any discharge, at least because... Doesn't it have some relevance? I don't think so, Your Honor. And if so, shouldn't that go into the mix to determine whether there's probable cause to give him an hearing? It doesn't in this Respondent's case, Your Honor, because as the Court is aware on this record, this Respondent was deemed fully employed for much of the time he was committing these rapes. He did have consensual sex partners for much of the time he was committing these rapes. He was... But why should those determinations be made at this stage? Why shouldn't it be deferred to a hearing? Well, the determination was made by Judge Porter that these, he considered them and said they were simply outweighed by the static 99 and Minsoster scores. And that the very same characteristics displayed in the GAF score were apparent from this Respondent's character and personality when he was committing rapes outside. If Your Honors have no further questions, we respectfully request that the Court affirm. About two minutes, Counsel. One is that Counsel's remarks today, like the State's experts, focused almost entirely on Mr. Lieberman's behaviors 30 years ago. And I want to just read to you one question and answer from Dr. Swire's testimony in the record. This is at page 46 of the December 10, 2008 transcript. How about the letters that he wrote to these women portraying himself in false light? I don't agree with that characterization. I do not agree with that characterization. I remember that from the first hearing. Yeah, I don't agree with that characterization factually in any event. And that was not evidence in the probable cause hearing. May I finish my comment about Dr. Swire's testimony? Here was the question. Here is the answer. And isn't it true, Doctor, that you have no evidence other than the fact of the 1979-1980 behaviors to support your paraphilia non-consent diagnosis? Answer, it is true. And I don't think any additional evidence is necessary. That was his answer. And I respectfully disagree with Dr. Swire because I think as we've discussed here today, the Illinois Supreme Court and U.S. Supreme Court jurisprudence says you have to have more than that. The final point I'd like to make, if I might, is Judge Porter's finding. And I think if you read his finding, it illustrates exactly how he misconstrued the statute and why there is probable cause. He begins his finding as follows. I find the whole statutory scheme a difficult thing to administer. I make no bones about that. I think part of my difficulty without going into my personal opinions about various and sundry types of testimonies is reflected by the disparity of opinions that are held by various members in the psychiatric and psychological professions regarding the DSM. So that's my point. He found that reasonable professionals disagree. And if reasonable professionals disagree, then you have the necessary reasonable belief that the Supreme Court of Illinois has said satisfies probable cause. Before you step away, if we read the transcripts of the testimony of the doctors and we read Judge Porter's decision as concluding that although there might be reasonable disagreements as to the existence or nonexistence of parapilia non-consent, Judge Porter concluded that Dr. Schmidt's testimony was not reasonable on the issue that he was there to testify about. Have you met this burden you're talking about? Well, Dr. Schmidt's testimony fell on two issues. If Judge Porter concluded he wasn't reasonable, where are we left? Well, the premise of your question I think is incorrect. Dr. Schmidt testified on two subjects. One, he testified that based on his own personal knowledge, the state's diagnosis isn't in the DSM. And the second thing he testified, the second subject matter was based on his own personal evaluation of Mr. Lieberman and his review of Mr. Lieberman's facility treatment records. Dr. Schmidt does not believe. But if Judge Porter at the end of the day concluded that Dr. Schmidt was not reasonable in his opinions, where are we left? Well, again, I think you have to parse it more carefully than that or more closely than that. Judge Porter found this opinion and this opinion only to be non-credible. He basically says, and I've got it right here, but he basically says, I don't believe Dr. If he can't believe it, how is it reasonable to the finder, the fact finder? Let me finish. Judge Porter was of the view that how could anybody who has committed this behavior 30 years ago not suffer from some kind of mental disorder today. That was his expressed opinion. He disagreed with Dr. Schmidt, the expert on that, and therefore declared Dr. Schmidt not believable. And I don't know whether that's a fair credibility finding on this record. I get back to the point, which is probable cause is not the point in the process where we're weighing testimony. Probable cause is a point where we're looking at whether reasonable people could disagree and whether there's a sufficient evidence to believe that, a reasonable belief as to the ultimate conclusion. And I think Judge Porter conflated the two. Are you saying that Judge Porter, that it was not within the latitude of his discretion to discount the testimony of an expert regardless of his preeminence in his area? If the testimony that he gave to the judge's ear, which is not off of mainstream, sounded to be spurious? Can't he simply disregard it? Not if the record doesn't support it. This isn't a situation where Dr. Schmidt doesn't have the credentials, not a situation where he didn't do the homework, not a situation where he was caught lying, not a situation where he was impeached. But he gave him an explanation that to this judge's ear rang as being totally implausible, and that conclusion of implausibility was supported by other expert testimony. That combination did not give the judge the latitude of discretion to reject that testimony. I'm not saying that I as a juror, I as a judge would reject it, but we're talking in the abstract. Doesn't that fall within the latitude of the trial judge? Not at this stage. Had there been a trial on the merits, yes, but not the probable cause hearing. So you're telling us we could criticize credibility rulings? Yes, if they lack any adequate basis in the record, yes. Do you have any case in Illinois or anywhere else that ever said that? Well, I don't have it here, but I think it's fairly self-evident that if a judge's fact findings, whether it be on credibility or anything else, lack a proper adequate factual basis, it can be disregarded. You may have cases, but they're extraordinary. Cases do exist, but they're generally extraordinary. And those cases, which I'm sure Judge Gordon is referring to, are in the context of a trial. This is a probable cause hearing. We don't get into a debate over whether the officer who testifies at a probable cause hearing is a credible person, whether he's got a discipline record or anything like that. The officer's testimony is accepted for the truth of the matter asserted. If you're throwing out probable cause in the sense of a preliminary hearing and that a judge has to find probable cause based on anything that's thrown in front of him, I don't know where that's coming from. I'm not suggesting anything that's thrown at him. I'm not urging anything that's thrown at the judge category or classification. I'm suggesting that if there's a reasonable basis to disagree among learned professionals and that reasonable basis to disagree is supported by the factual record. You may disagree with it. You may have different inferences. You've met your probable cause threshold under this statutory scheme. That's all I'm saying.